UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA        :

   *-v.-*                                                      :        17 Cr. 684 (ER)

ANTHONY BLAND,                         :

                  Defendant.        :

---------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM

                                              GEOFFREY S. BERMAN
                                              United States Attorney
                                              Southern District of New York

Robert L. Boone
Noah Solowiejczyk
Eli J. Mark
Assistant United States Attorneys

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA          :

   -v.-                                             :          17 Cr. 684 (ER)

ANTHONY BLAND,                        :

                      Defendant.           :

---------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Anthony Bland is scheduled to be sentenced on Wednesday, May 29, 2019, at 11:00 a.m. The Government respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum (Dkt. No. 233) ("Def. Mem.").

## PRELIMINARY STATEMENT

The defendant abused his role as a men's basketball coach and mentor to student-athletes to take a cash bribe in a Las Vegas hotel suite in exchange for steering these athletes to retain the services of co-defendant Christian Dawkins upon turning pro. Instead of prioritizing his student-athletes' best interests, he referred to his student-athletes as chips to be bargained with in his relationship with Dawkins. The young men he coached were "layups" for the defendant, and future professional players that the defendant could place in "the lap" of Dawkins and his newly formed company, without regard to the fact that Dawkins had no experience as an athlete-advisor and had recently been fired from his job with an elite sports agent for alleged misuse of a NBA player's credit card.

1

The defendant's suggestion, through counsel, that his crime is somehow less serious or deserving of punishment because the legal victim of his crime is a federally-funded university, or because his conduct involved violations of NCAA rules, should not be countenanced. The defendant admitted to engaging in a federal crime, not a mere rules violation, by pocketing thousands of dollars in cash and placing his personal interests above those of not just his employer (the university) but also of his team, his players, and their future. Although the student-athletes were not the legal victims of the bribery scheme, these student-athletes were unquestionably harmed by the defendant's conduct, which jeopardized not simply their collegiate careers but their ability to make one of the most important decisions of their future professional careers.

The Government submits that, in this case, a meaningful punishment that includes a term of incarceration is necessary. In particular, and for the reasons set forth herein, the Government respectfully submits that a sentence within the applicable Guidelines range of 6 to 12 months' imprisonment is appropriate and sufficient but not greater than necessary to promote the legitimate ends of sentencing.

## BACKGROUND

### A. The Defendant and the Offense Conduct

The defendant was an assistant head coach of the University of Southern California ("USC")'s men's basketball team from 2013 until his arrest on September 26, 2017. The defendant's participation in the bribery scheme to steer his student-athletes to Dawkins and his new company began with a late-night meeting in a Las Vegas hotel suite on July 28, 2017. That night, at a suite in the Cosmopolitan, the defendant met with Dawkins and two individuals who he believed were investors in Dawkins's business – Jeff D'Angelo and Martin Blazer -- but who, in reality, were working with the Government. That night, the defendant received a cash bribe,

for his participation in the scheme.  Dawkins handed the defendant an envelope containing $13,000 (Tr. 433-34); the defendant kept $4,100, while Dawkins held on to the rest.  (PSR ¶ 78.) During the meeting, the defendant and Dawkins discussed additional cash bribes in the future, whether they would be on a monthly or "as-needed" basis, where and how the defendant might get them, and they further agreed, at this juncture, that Dawkins would help the defendant with money "as-needed" to pay to prospective student-athletes and/or pay to the defendant for expenses the defendant incurred in recruiting them.[1] (GX 524T, p.6 ("[I]t's going to be on an as-needed basis, basically."); Tr. 430-33.)   The defendant later was also recorded noting that he had had similar opportunities to work with other corrupt agents before – apparently referring to an offer of cash bribes from another athlete-advisor/agent -- but the defendant added that he thought the instant scheme was better since the prior situation had not been as "clean" and the defendant trusted Dawkins.  (GX 521AT, p.5 ("So, we've had this opportunity before, but it's not been this clean. And from a guy that I'm really – that I trust.").)

As the trial evidence demonstrated, during that Las Vegas meeting and another meeting in Los Angeles, and as captured on several phone calls that were intercepted, the defendant willingly and with apparent ease placed his personal interests above the student-athletes he was supposed to guide, counsel and mentor.  Instead of being a role model for these students, the defendant's conduct demonstrated a blatant disregard for not just the rules, but also his students' own well-being, as he made efforts to steer them to Dawkins, an inexperienced and under-qualified athlete-advisor with a track-record of alleged fraud and partners who neither knew anything about.

---

[1] Unless otherwise noted, GX references are to Government Exhibits admitted into evidence in the trial of *United States v. Christian Dawkins and Merl Code*, (S1) 17 Cr. 684 (ER). Transcript references, unless otherwise noted, are to the trial transcript.

For example, the defendant explained how he would influence and control the school's student-athletes in return for the cash bribes paid by Dawkins:

> [W]hatever it is that I have control over, that's coming through USC, I'm gonna have something to do with it.  You know … I have some guys that I bring in that I can just say, this is what you're fucking doing.  And there's other guys who we'll have to work a little harder for, but we'll still have a heavy influence on what they do.

(GX 524T, p.1); (*see also* GX 521 AT, p.6 ("I can put them in the lap of you guys.").)  Thus, for some student-athletes, like Taeshon Cherry, a prospective student-athlete whom the defendant had recruited and who had verbally committed to USC,[2] the defendant bragged that he could "say this is what you're doing.  But other guys, you kinda gotta – you gotta weasel and push them that way before it's too late …." (GX 521AT, p.3.)

The defendant also touted how he would influence the student-athletes he was supposed to coach and mentor (Tr. 1136).  For example, the defendant said he was going to introduce Dawkins and his co-conspirators to these student-athletes starting on their "first day on campus," while they were still impressionable and before they had met any other advisors.  (GX 524T, p.5.)  And, the defendant did in fact, only a month after agreeing to participate in the bribery scheme, on August 31, 2017, put Dawkins and his investors in meetings with the family of Cherry and the associate or "handler" of a then-current student-athlete, De'Anthony Melton.  (*See* PSR ¶ 76, 77.)

The defendant also discussed with Dawkins, on an intercepted call how he had expended $2,200 of his personal funds in connection with visits by ▮▮▮▮ and another prospective student-

---

[2] After the defendant's arrest, Cherry decided not to enroll at USC, and instead committed to Arizona State University. *See* Rob Goldberg, *Taeshon Cherry Switches Commitment to Arizona State from USC*, BLEACHER REPORT (dated January 17, 2018), *available at* https://bleacherreport.com/articles/2754531-taeshon-cherry-switches-commitment-to-arizona-state-from-usc

4

athlete to USC's campus, and how Dawkins would need to reimburse him for those expenses, as part of the scheme. (*See* Dawkins Wiretap, Session 12032.[3]) About five days after requesting this additional bribe, the defendant, Dawkins, and others were charged and arrested for various offenses, including bribery. The defendant was immediately put on paid administrative leave, and a few months later was fired by USC. De'Anthony Melton, a USC sophomore at the time, did not play another game for USC.

### B. The Charges and The Defendant's Guilty Plea

Indictment 17 Cr. 684 (ER) charged the defendant, Dawkins, Merl Code and two other coaches in multiple counts with participation in the bribery scheme described above. On January 2, 2019, the defendant pleaded guilty to the first count of the indictment, which charged conspiracy to commit bribery, in violation of 18 U.S.C. § 371, and he also agreed to forfeiture of $4,100. The other two coaches subsequently pled guilty to the first count of the indictment,

---

[3] The defendant and Dawkins further discussed how Dawkins would tell his investors that he needed $5,000 to pay the defendant, and then Dawkins would split that with the defendant – $2,500 for each of them, as follows:



5

shortly thereafter. (PSR ¶¶ 15-16.) On May 8, 2019, after a two and half week trial, a jury found co-defendants Dawkins and Code guilty of conspiracy to commit bribery, and Dawkins guilty of the substantive crime of bribery.

### C. The Applicable Guidelines

In every case, the Guidelines range is the "starting point and the initial benchmark" for a sentence. *Gall* v. *United States*, 552 U.S. 38, 49 (2007); *see also* 18 U.S.C. § 3553(a)(4) (requiring consideration of applicable Guidelines range in determining appropriate sentence). As set forth in the parties' plea agreement and by the Probation Office, the base offense level is 12;[4] and a two-level decrease is warranted pursuant to U.S.S.G. § 3E.1 due to the defendant's acceptance of responsibility prior to trial. (PSR ¶¶ 91-99.) Combined with a criminal history category of I, the Guidelines range is 6 to 12 months' imprisonment. (PSR ¶ 143.)

## DISCUSSION

### I. A Meaningful Sentence – Within the Applicable Guidelines Range -- is Warranted

A Guidelines sentence is appropriate and would meet the objectives set forth in 18 U.S.C. § 3553(a), given (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (B) to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(1), (2)(A)-(B).

As a threshold matter, the offense was undoubtedly serious. The defendant's participation in the bribery scheme not only betrayed his employer, but the very young men he

---

[4] The plea agreement calculated that the amount of the bribe was less than $6,500, and therefore no additional enhancements applied (PSR ¶ 13), because the Government credited the defendant's explanation that he only pocketed a $4,100 portion of the $13,000 originally directed for his benefit during the Las Vegas meeting (PSR ¶¶ 78, 89, 92).

coached and to whom he was supposed to mentor. Although the defendant only received a single bribe payment before he was arrested – a fact reflected in the relatively low applicable Guidelines range -- the defendant plainly envisioned an ongoing relationship with Dawkins and his company, a relationship that would potentially entail tens if not hundreds of thousands of dollars in bribes over time, and one they needed to engage in covertly in order to keep the defendant "clean," and avoid scrutiny from the NCAA. Receiving a cash bribe, even a single one, is worthy of punishment in its own right, but participating in a scheme that entails willingly and deceptively using student-athletes for one's own means, seemingly without regard for the consequences, warrants a punishment that includes a custodial term.

The defendant's suggestion that his crime is not actually serious because USC "is not the usual crime victim," (Def. Mem. 3) or because USC is not a victim at all (*id.*) should be swiftly rejected.[5] There is no doubt that the defendant misused his position at USC to commit the crime, that he hid his crime from USC, and that his conduct now exposes USC to significant potential penalties from the NCAA. Moreover, completely absent from his sentencing submission is any recognition of the effect of the defendant's conduct on the student-athletes he was supposed to coach and mentor, student-athletes who trusted the defendant and who were completely unaware of his criminal conduct.

---

[5] The defendant's further suggestion that the jury's verdict, with respect to the trial defendants, of not guilty on the honest services counts suggests that universities were not victims of the defendant's bribery scheme is baseless. (Def. Mem. 3.) As an initial matter, there is neither basis nor reason to speculate as to the course of the jury's deliberations. Moreover, the trial evidence conclusively established that the universities did not know and certainly did not approve of the sort of bribe payments the defendant accepted, and were subjected to the real risk of economic harm as a result. Indeed, the fact that USC immediately placed the defendant on leave upon learning of the allegations and subsequently terminated his employment starkly belies the notion that the University was anything but a victim of the defendant's conduct.

The defendant's further suggestion that USC should not be considered a victim because, as he suggests, the university engaged in "bribery" by hiring an assistant coach whose sons were top recruits (Def. Mem. 3-4), should also be swiftly rejected. The university's hiring decisions have no bearing whatsoever on the defendant's deceitful and criminal conduct. There are certainly no similarities between that recent hiring decision and the defendant's willingness to steer unsuspecting young men to engage unqualified professional representation in exchange for the defendant's receipt of a cash bribe.

Second, and beyond the seriousness of the offense, deterrence militates in favor of a meaningful sentence. With respect to general deterrence, in particular, and as this investigation and two recent trials have made clear, there are unfortunately too many bad actors in and around college basketball that are willing to take advantage of student-athletes and to put personal greed ahead of the best interests of the students they are ostensibly intended to mentor and support. A meaningful sentence is necessary to send an important message that the conduct to which the defendant pled guilty was harmful, criminal, and will be appropriately punished.

In fashioning an appropriate sentence, the Government agrees with the defendant that the Court should also be mindful of Section 3553(a)'s command to avoid unwarranted sentencing disparities, and the Government does not dispute the defendant's suggestion that he is the least culpable defendant charged in the case. (Def. Mem. 3.) However, that is already reflected in the fact that the defendant's applicable Guidelines range is lower than that of any of his co-defendants. No further discount, therefore, is either necessary or appropriate to account for this defendant's role as compared to that of his various co-defendants.

Finally, the Government takes no issue with the defendant's descriptions of his background and the relationships with his friends and family, which are doubtless important to

the parties involved if not unusual. This conduct is laudable and worthy of consideration by the Court pursuant to Section 3553(a). But the Government respectfully submits that although his sentencing submission discusses significantly his role as a mentor, counselor, and advisor, it is noteworthy that the defendant does not appear to demonstrate any remorse for how he betrayed all of those roles as a coach in engaging in this offense. His sentence should reflect his failure to live up to the same ideals he espoused to others.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a meaningful sentence, consistent with the Guidelines, a sentence that is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: New York, New York
       May 22, 2019

                                Respectfully submitted,

                                GEOFFREY S. BERMAN
                                United States Attorney

                   By:    s/ Eli J. Mark
                           Robert L. Boone
                           Noah Solowiejczyk
                           Eli J. Mark
                           Assistant United States Attorneys
                           (212) 637-2208/2473/2431