J659BLAS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              17 CR 684 (ER)

ANTHONY BLAND,

          Defendant.

------------------------------x

                             New York, N.Y.
                             June 5, 2019
                             10:28 a.m.

Before:

                  HON. EDGARDO RAMOS

                             District Judge

                    APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
ELI J. MARK
NOAH D. SOLOWIEJCZYK
ROBERT L. BOONE
    Assistant United States Attorneys

LAW OFFICES OF JEFFREY LICHTMAN
    Attorneys for Defendant
JEFFREY H. LICHTMAN
JEFFREY B. EINHORN

J659BLAS

1        (Case called)

2            MR. MARK:  Good morning, your Honor.  Eli Mark, Noah

3    Solowiejczyk, and Robert Boone on behalf of the government.

4            MR. LICHTMAN:  Jeffrey Lichtman and Jeffrey Einhorn

5    for Tony Bland.  Good morning, your Honor.

6            MR. EINHORN:  Good morning, your Honor.

7            THE COURT:  Good morning to you all.

8            This matter is on for sentencing and in preparation

9    for today's proceedings I have reviewed the following.  I have

10   reviewed the presentence report last revised on April 8, 2019,

11   prepared by U.S. Probation Officer Nicolo DiMaria.

12           I've reviewed the sentencing letter submitted by

13   Mr. Lichtman dated May 15, 2019 which includes letters written

14   by various of Mr. Bland's family and friends.

15           I also received yesterday a letter from a Sidney

16   Kamlager-Dove who is a California state assembly person

17   concerning Mr. Bland's work with an organization called the

18   Brotherhood Crusade.

19           I've reviewed the government's submission dated

20   May 22, 2019 as well as the victim-impact statement from the

21   University of Southern California received under cover letter

22   dated May 31, 2019.

23           Is there anything else that I should have received or

24   reviewed, Mr. Mark?

25           MR. MARK:  No.  And I'll just note that we haven't

J659BLAS

```
1   received or reviewed the last letter that you mentioned, I

2   think received yesterday's date.

3             THE COURT:  I can hand it to counsel.

4             MR. MARK:  Sure.

5             MR. EINHORN:  Your Honor, we haven't seen it as well.

6             THE COURT:  You can read it also.

7             MR. LICHTMAN:  Thank you.

8             THE COURT:  Mr. Lichtman, beyond that letter is there

9   anything else that I should have received or reviewed?

10            MR. LICHTMAN:  No, your Honor.

11            THE COURT:  OK.

12            Mr. Lichtman, have you read the presentence report and

13  discussed it with your client?

14            MR. LICHTMAN:  I have, Judge.  We have no objections.

15            THE COURT:  Mr. Bland, have you read the presentence

16  report and discussed it with your attorneys?

17            THE DEFENDANT:  Yes, your Honor.

18            THE COURT:  Are there any objections to the report

19  concerning its factual accuracy?

20            THE DEFENDANT:  No, your Honor.

21            THE COURT:  Very well.  Although I am not required to

22  impose a sentence within the guidelines range, I am required to

23  consider the range in imposing sentence and to do so I need to

24  make the calculation.

25            Mr. Bland pleaded guilty to Count One of the
```

J659BLAS

1    indictment which charges him with conspiracy to commit bribery

2    in violation of 18 U.S.C. Section 371.  That offense carries an

3    offense level of 12.  There are no other mitigating or

4    aggravating enhancements with the exception of the two-level

5    reduction for acceptance of responsibility, yielding a total

6    offense level of 10.  Because Mr. Bland has no prior criminal

7    convictions he is in criminal history category I.

8            Any objection to that calculation, Mr. Mark?

9            MR. MARK:  No, your Honor.

10           THE COURT:  Mr. Lichtman?

11           MR. LICHTMAN:  No, your Honor.

12           THE COURT:  Very well.  There being no objection I

13   find that the criminal history category is I and the total

14   offense level is 10, yielding a guidelines range of 6 to 12

15   months.

16           Mr. Mark, does the government wish to be heard before

17   the imposition of sentence?

18           MR. MARK:  Yes, your Honor.

19           What I note that was particularly lacking in the

20   defendant's sentencing submission was really a discussion about

21   the conduct here and I want to talk briefly about the conduct

22   because the conduct was serious, it was thoughtful, it was

23   deliberative.

24           When the defendant flew to Las Vegas at the end of

25   July he had made it near the top of his profession.  He was an

J659BLAS

associate head coach at a top college basketball program at

USC.  But the defendant wanted more.  And when he arrived at

the hotel suite in Las Vegas at the Cosmopolitan he wasn't

looking out for his employer, USC.  He wasn't looking out for

the kids that he coached or was hoping to coach at the school.

He was looking out for himself when he agreed to take bribes

from Christian Dawkins.  He got $4,100 that night and they

talked about Dawkins and his company and they could get more

money for a top recruit, someone like Marvin Bagley if he went

to the University of Southern California, and they talked about

how and where they would deliver more cash to the defendant

because he was in L.A. and Dawkins was in Atlanta and the

investors were over on the East Coast, because they all knew

what they were doing was wrong when they were there in that

hotel room.

        And after that meeting, as we detailed in our

submission, Tony Bland went into action to help steer kids, and

these were kids, we're talking about young men, to Dawkins and

his company and he talked about who he could do that with.  He

named names.  And he said that he could do it because these

people, these kids trusted him.  And he also took steps to

connect Dawkins up with the families of these individuals, of

these kids.  And that had serious consequences.  Not only was

this bribery but this also had the consequence, the potential

consequence to jeopardize the eligibility of these young men to

J659BLAS

1    play basketball.

2           He did that I would submit probably because the

3    defendant, like many others, had a disagreement with what the

4    rules for the NCAA said.  The NCAA rules obviously provide that

5    college basketball players are amateurs.

6           Two things here.  One, this case is not about whether

7    the rules are right or wrong; this case is about bribery.

8    There is no question that bribery is wrong and the defendant

9    obviously pled guilty here.  Bribery is a crime and it's clear.

10   And two, the mere fact that somebody was operating in college

11   basketball and had a disagreement with the rules does not

12   excuse conduct like bribery.  It doesn't excuse conduct that

13   clearly takes advantage of young men and jeopardizes their own

14   careers.  That's serious conduct.  It's deliberative conduct.

15   It was conduct while started in a hotel room in Vegas continued

16   on and would have continued on for much longer.

17          What is also noteworthy about the conduct here is that

18   not just was it deceptive in the context of engaging in

19   bribery, but there was another layer of deception involved in

20   Mr. Bland's conduct which was that the funder of the bribes,

21   these investors that Dawkins and Tony Bland were essentially

22   sharing.  There was $13,000 dedicated to Tony Bland.  And

23   Dawkins and Mr. Bland split that money.

24          THE COURT:  How was that determined?  How was it

25   determined that Mr. Bland would get $4,100 and Mr. Dawkins the

J659BLAS

1    balance?  Do you know?

2           MR. MARK:  We don't know the internal -- the

3    discussions between Tony Bland and Christian Dawkins.  Those

4    weren't recorded.  But we see some reflection of that in the --

5    in another phonecall which the government detailed in its

6    sentencing submission.  And there they talked about well

7    Mr. Bland wanted 2500.  Then Christian Dawkins said well I'll

8    ask for five thousand and then we'll split it 25/25.  So I

9    think that sort of gives some insight into how their

10   relationship was such that they knew investors were giving

11   money so they could share the money that was given, the bribe

12   money.

13          THE COURT:  Do we know whether Mr. Bland intended to

14   use the money that would go to him in order to pay recruits or

15   players at USC, if you know?

16          MR. MARK:  I think there's a couple things.  First,

17   the initial bribe, $4,100 that Mr. Bland received.  That was

18   for him and for him personally.  There was further discussions

19   about how he would get paid.  There was discussions in that

20   hotel suite about whether it would be monthly, whether it would

21   be as needed.  I think ultimately they talk, maybe this is

22   going to be an as-needed situation.  And there was discussions

23   further about him being reimbursed for out-of-pocket expenses

24   that he had.  So there was a number of different discussions

25   about how he would get paid in the future.

J659BLAS

1          THE COURT:  OK.

2          MR. MARK:  As I said, this was serious conduct that we

3    believe merits an appropriate sentence here.  And while the

4    guidelines are low here -- I mean there is no question about

5    that, we do think that there should be a meaningful sentence

6    because the nature of the conduct and that there should be

7    deterrence here because this was serious conduct; because, as I

8    think there's really no dispute, that the defendant was

9    operating in a space where there were other people who were

10   engaging in this sort of deceptive and dishonest conduct, there

11   should be a meaningful sentence that promotes the interests of

12   deterrence here.

13          THE COURT:  Let me ask you this.  As I read your

14   letter, I understood the government to acknowledge that

15   Mr. Bland was the least culpable of the defendants here.  Was

16   that meant to include the other related cases that the

17   government is prosecuting in this district?

18          MR. MARK:  No.  That was meant to reflect these

19   defendants who are charged in this indictment.  I mean the

20   conduct here that the defendant was engaged in, I think that

21   there is a couple of factors that really make this particularly

22   serious.  One is that he was -- his relationship to these

23   students, right.  He was a mentor to these students.  And I

24   think the fact that that places him somewhat differently than

25   somebody who is necessarily a consultant to a shoe company who

J659BLAS

1    has a different relationship with a student.  I think those are

2    factors that the Court should consider.  How they play out in

3    the guidelines and how they play out to ultimate culpability

4    really have many different factors to be considered.

5            THE COURT:  Again, as I understand the government's

6    theory, the players that Mr. Bland coached were hurt in that

7    their NCAA careers were put in jeopardy because if this were

8    found out, as it was, they would not be allowed to play; is

9    that right?

10           MR. MARK:  Yes.  There's two reasons, your Honor.  One

11   is as we laid out.  What the defendant was doing was he was

12   steering his kids, his players, to Christian Dawkins, who was

13   an adviser who first had been terminated because of alleged

14   misconduct from Andy Miller's employment, somebody who had no

15   track record of or experience to indicate that he would be

16   somebody who should be trusted to manage these kids' money; and

17   that he was doing that, and there was discussions about how he

18   was doing that because to push him over to Mr. Dawkins as

19   opposed to other people who were more reputable.  There was

20   intercepted calls that reflect his discussions with a player

21   where another coach was saying:  Oh, this player should go to a

22   different agent, one who is -- with an established company.  He

23   said he was trying to prevent that coach from blocking his

24   efforts, blocking his scheme to move this kid over to

25   Mr. Dawkins.

J659BLAS

1          So he was harming that in that first instance by

2     steering them, for obviously undisclosed reasons, to those

3     kids, to Mr. Dawkins; and two, because of the nature of how he

4     was -- this scheme was working in the sense that he was

5     connecting up handlers of these students with Mr. Dawkins, he

6     was potentially jeopardizing their eligibility to play.  And we

7     noted that one of the players on that team didn't play the next

8     year after Mr. Dawkins was charged.

9          THE COURT:  But do we know why he didn't play?

10          MR. MARK:  There was a number of different factors.

11     This started a review.  But this was -- there was a number of

12     different factors that led to USC making that determination.

13     But what they talked about essentially connecting Mr. Dawkins

14     up with handlers, that was directly going to implicate those

15     kids' eligibility and there didn't seem to be any concerns

16     about engaging in that sort of conduct, willingly putting these

17     kids' eligibility at risk.

18          THE COURT:  Just curious, Mr. Mark, and I don't know

19     whether or not the government has done this.  But we haven't

20     heard from any of the students, any of the players.  Were they

21     interviewed?  Were they put into the grand jury?

22          If you know.

23          MR. MARK:  We obviously can't discuss about what

24     happened or didn't happen before the grand jury.

25          THE COURT:  Right.

J659BLAS

1            MR. MARK:  Because of the grand jury's secrecy.  But

2      there were interviews of students that were done and -- talking

3      broadly about students.  Of all the students who were

4      interviewed, they didn't know about the schemes and the bribery

5      that their coaches were involved in; not talking particularly

6      about Mr. Bland, but other coaches talked about how they would

7      obviously not tell the students; and how if the students asked

8      about why are we being set up with a particular coach, they

9      would give some explanation, obviously hiding the fact that

10     they were receiving bribes.

11            THE COURT:  Let me ask you this before you sit down.

12     Mr. Lichtman has suggested that -- well he said in so many

13     words that the University of Southern California is not

14     strictly speaking a victim.  He suggests that they were not

15     only aware of this type of activity but that more recently in

16     connection with two of their current recruits they offered a

17     job to the father of those recruits and that suggests that that

18     is just another way of basically gaming the system.

19            Do you have a response to that?

20            MR. MARK:  I think there's two parts to your question.

21     First, they clearly were a victim here.  They did not know what

22     Mr. Bland was doing.  They didn't -- he lied to them.  We saw

23     at the trial, there's a compliance department.  It was a

24     significant compliance department, led by significant, serious

25     people, by a lawyer.  We heard and saw how there were different

J659BLAS

policies as well that dealt with advisers particularly because
they wanted -- they were aware of the fact that a lot of their
students would potentially be professionals and they wanted to
protect them and make sure that everybody was complying
properly.

        Further, USC was really taken aback when they heard
about Mr. Bland's conduct because they had -- Mr. Bland had
been somebody who had supposedly to them been dedicated to
compliance.  He had represented them to the NCAA on a certain
compliance initiative.  And yet he was, at the same time he was
representing that he was actually dedicated to the rules, he
was engaging in this conduct.

        What we further know is that on the day that he met in
LA with Christian Dawkins and Munish Sood and the investors to
discuss the bribery scheme, that very day he was supposed to be
meeting with compliance from USC.

        So USC took compliance seriously, A; and B, putting
compliance with the rules aside, I mean they clearly were the
victim of this bribery scheme.  So, second, as to their sort of
hiring practices, their hiring practices, I mean, are really
sort of aside the point.  I think we address that in our
submission that that hiring practice didn't have anything to do
with any payments from any agents, advisers.  It didn't have
anything to do with taking advantage of any student athletes in
making any of their business decisions.

J659BLAS

1        So whatever Mr. Lichtman wants to say about their

2   hiring practices it really has nothing to do with Mr. Bland's

3   conduct.

4        And further, what I would note is that what Mr. Bland

5   did, which was steering players to Christian Dawkins and his

6   company, didn't actually help out USC in any way.  There is no

7   competitive advantage that the school could get from a coach

8   who is corruptly steering a player to a particular agent or

9   adviser.  There is no benefit to the school from that conduct.

10  So to suggest that they are in some way not victimized or in

11  some way complicit in this conduct is clearly unsupported and

12  illogical.

13        THE COURT:  Thank you.  Mr. Lichtman did you wish to

14  be heard?

15        MR. LICHTMAN:  I'm going to address some of the stuff

16  that was just said now and then I'll go back to the beginning.

17        With regard to the father of the two recruits, the

18  Mobley brothers, the former FBI director, Freeh, was hired by

19  USC to vet the basketball program after Mr. Bland was arrested.

20  I'm sure countless millions were spent on that vetting process.

21  After it was completed, USC took the job that was vacated by

22  the firing of Tony Bland and gave it to the father of the

23  number one recruit from the 2020 class and the number 10

24  recruit for the class of 2019, gave him that assistant job.  Lo

25  and behold -- I know this is going to shock you -- the elder

J659BLAS

Mobley brother signed with USC and the younger one, who was,

again, number one in the class, you can be sure will be signing

with USC when given the opportunity when the signing period

starts.

They were roundly criticized.  Your Honor knows, I put

in an article in our papers, that it was slimy, and this is not

the kind of thing that happens never in the NCAA; surprise,

surprise.

I remember, as a young basketball fan in the late

'80s, Kansas hired Danny Manning, who was a superstar in high

school at the time.  His father, Ed Manning, who was a truck

driver, he became the assistant counsel.  Lo and behold, Danny

Manning went to Kansas.  Kansas won a national championship.

With all respect to USC, to suggest that they are

clean hands, they know nothing; they're one of the most

penalized athletic programs in the history of the NCAA.  As of

right now, today, what's happening, there was a gynecologist

that worked at USC.  There were eight complaints about sexual

abuse that were made by students.  USC buried them all.  They

never referred the doctor to the state licensing board and

ultimately it came out, and they're being sued, and God knows

what else will happen after.

In addition, as we all know, the admissions scandal

that occurred recently, that's been all over the papers.  There

have been a number of coaches at USC that have been arrested,

J659BLAS

1    charged with that bribery case, receiving millions of

2    dollars -- not $4,100 -- millions of dollars.  USC didn't know

3    about that either.

4           And all of this stuff occurred, obviously, after

5    millions were spent on Louie Freeh for that vetting process.

6           THE COURT:  But how does that redound to the benefit

7    of Mr. Bland here?

8           MR. LICHTMAN:  The point is --

9           THE COURT:  There was an issue at the trial, that the

10   jury raised actually, that can the institution be victimized if

11   individuals at the very highest levels of the institution are

12   corrupt?  And why isn't the answer yes, the institution itself,

13   despite the fact that there are, you know, bad, bad employees,

14   the institution suffers.

15          MR. LICHTMAN:  Well I think the institution, to some

16   extent, is rotten is the point of what I said.

17          That being said, we pled guilty for a reason.  I

18   acknowledge the fact that there was a victim in the case.  I

19   didn't say that USC wasn't the victim.  I just said that they

20   were not the typical fraud victim, and that's all I'm saying.

21   I'm not suggesting that they were not victimized.  I don't

22   think that there's any evidence that suggests that Tony Bland

23   was pushed to do this by USC.  I'm just saying this is what

24   existed at USC at the time.  It's not exactly a paragon of

25   virtue in the NCAA landscape was all I was trying to -- all I

J659BLAS

1    did say.

2              With regard to the players that were involved in this

3    case, he's acknowledged his guilt.  I understand that my

4    sentencing memorandum can be boring sometimes but it was on

5    page 17.  We paraphrased a bunch of letters that talked about

6    his remorse for what he the did.  That exists.  And I

7    understand maybe you didn't get that.  I don't blame them.

8    It's not the most interesting read, but it was there.

9              With regard to the two players that were involved in

10   this case.  De'Anthony Melton has now been the starting point

11   guard for the Phoenix Suns.  I'm not suggesting that excused

12   the behavior.  I just wanted you to know how it ended.

13             With regard to Taeshon Cherry, he transferred to

14   Arizona State.  And he'll being playing there, probably for a

15   higher-ranked team.

16             Again, it doesn't excuse the behavior.  I just want to

17   give you a fuller picture as to what happened to these players.

18             The truth is, and Mr. Bland will acknowledge, it was a

19   very dangerous game and if it wasn't for the fact that Melton

20   and Cherry were so talented this could have ended much worse

21   for them.

22             THE COURT:  I'm sorry.  What do you mean by that?

23             MR. LICHTMAN:  It could have been where they lost

24   their eligibility, which they didn't.  It could have been where

25   they couldn't make it in the NBA.  It could have been where

J659BLAS

perhaps no other college would want them.  The fact that they

bounced back and bounced back well is not a positive for Tony

Bland.  I just wanted to give you an indication as to what

ultimately happened to these two players.

THE COURT:  Do you have any insight as to why -- I

forget which one of the players it was -- did not play for USC

the subsequent year?

MR. LICHTMAN:  I believe that Melton was being held

out pending their investigation.  And finally at some point

Melton decided instead of getting back to USC, it makes more

sense, he was a top 20 consensus draft choice, and he felt I

should concentrate on my career, which is getting ready for the

NBA instead of worrying about getting back to USC.  He did

that.  He worked out for the year.  He ended up getting drafted

in the high teens, was it 21, it was somewhere, and is now, as

I said, the starting point guard for the Suns.  I'm not

suggesting this is no harm/no foul, you'll excuse the pun.

That's what happened.

This is a job preparation situation.  Sometimes it's

hard for people like us to understand because we went to

college perhaps not with the idea that one year was going to

get us ready for our careers.  For De'Anthony Melton he needed

to workout, show teams what he was capable of doing.  He did.

An he was drafted exactly where he was expected to be drafted.

Again, it does not inure to Tony Bland's benefit.  Although he

J659BLAS

1    coached him, I'm not suggesting that that's a gold star for

2    him.  I'm just trying to give you a fuller picture as to what

3    happened to those two players.

4              THE COURT:  OK.

5              MR. LICHTMAN:  With regard to who is most culpable,

6    obviously the government's acknowledged that Tony Bland is the

7    least culpable in this case.  His guidelines of six to twelve

8    months are also the lowest than all of the cases.  I don't

9    think there's anybody else, and Mr. Mark will correct me if I'm

10   wrong, who is at that low level of guidelines for anybody

11   charged.  And there's a reason why the guidelines are the

12   lowest is because his criminal activity was the least.  That's

13   how the guidelines work.  It's how it's always worked.  If your

14   guidelines are very high, you've done something very bad.  If

15   they're very low, you've done something not as bad.

16             There was a question or a comment made that the

17   consultant to the shoe company perhaps isn't as bad as

18   Mr. Bland in terms of culpability.  I think he's referring to

19   Merl Code who received six months after he was convicted in the

20   first trial; six months, after he blew the trial; then went to

21   trial again and lost that one as well.  His guidelines were in

22   the 20-something range; much higher than six to twelve because

23   his culpability was much worse.  And the government actually

24   agreed with probation's recommendation for eight months in that

25   case after he blew the trial.  So, respectfully, the idea that

J659BLAS

1    Merl Code is not as culpable as Tony Bland is ludicrous after

2    he blew trial and the fact that his guidelines were double what

3    Tony Bland's were.

4              But let me go on, Judge.

5              This case is -- it's different in so many ways, I

6    think in terms of cases that we get here.  This is a fall from

7    grace that is almost Shakespearean.  You've got someone, and

8    this was acknowledged in their papers, I think there was a

9    sentence in it that acknowledged the unbelievably, ridiculously

10   bad background that Tony Bland had.  Not only is he the least

11   culpable in all three of these cases with the lowest

12   guidelines, I don't know that you could have a more horrific

13   upbringing and overcoming it for what Tony Bland did.  This is

14   what's so sad, is that he started from the most horrible

15   circumstances.  Somehow it was a miracle that he actually

16   survived it and flourished.  Anybody else in this situation

17   would have died in a gang shooting ten years later when he was

18   a child the way he grew up.

19             It was the most difficult childhood imagined.  Not

20   only did he flourish and make a success of himself, he was a

21   positive figure in the community.  Every letter you see how

22   helpful he is.  This is the kind of guy he is.  And you don't

23   know him, Judge, because you've only seen him here.  This is a

24   guy that's inside is dying after what happened to his life, a

25   fall from grace; but outwardly he's been positive, and he's

J659BLAS

always been that way.  When things were horrible for him as a

child; the police chasing his father, his mother was addicted

to drugs and dropped him off with a schizophrenic grandmother,

the violence that he had to live through, the extreme poverty,

absolutely horrific.  He always had a positive outlook and said

somehow I'm going to overcome this.  He didn't overcome it by

dealing drugs.  He didn't overcome it by getting into a gang.

He overcame it by having a positive attitude and working on the

one skill that he had, which was basketball.  And to lose all

of that now, this was someone who was held up, again, as a

paragon of virtue in the community, after all he had to

overcome; his father being in jail most of his life and being a

violent gang member.  He had a family that was proud of him in

the community.  People revered him because he had done so many

good things.  They didn't revere him because he was rich or

that he was a powerful guy.  They revered him because he was

helping out other people that had upbringings like him.  He did

all the positive things.  And the fall from grace, the tragedy,

and this is just stunning.  We learned about how he was raised

by his grandparents in lots, how his mother had him when she

was 14 years old, that they had extreme poverty, that he would

sometimes rummage through garbage pails so that he could eat.

That's how his life began.  He ended up getting shuttled off to

his aunt after his grandmother died.  As I said, this is a

one-in-a-million shot here for Tony Bland.

J659BLAS

1            And I don't know how things would be different if he

2    were raised like me or Mr. Mark.  Respectfully, I don't know

3    how you were raised, but I'm sure it was pretty good, you seem

4    like a nice boy.  I think that had he had the opportunities we

5    had, things would be different.  If we were in his situation, I

6    don't know how we would be today.  But the fact that he

7    overcame this, instead of succumbing to the streets that

8    everybody around him did, is a miracle.  And I respectfully

9    suggest that, according to the factors that should be weighed

10   here, that's a big deal.  He worked himself into becoming a

11   star basketball player and he earned a scholarship at Syracuse

12   and that's how he raised himself out of the muck.  He then

13   transferred to San Diego State where he was a star there.  And

14   he was beginning a professional basketball career that could

15   have lasted fifteen years.  And then he blew out his knee.  And

16   perhaps anybody else would have just given up and said, you

17   know what, I got this far, after all I've overcome, I'm going

18   to give up.  He didn't.  Because that's not the guy he is.

19   He's a positive guy.  And I know this because I've known him

20   now for, coming on two years, and this is how he is.  He's

21   always positive.  I know inside -- I just said it to him this

22   morning, I know that you're happy and you're smiling to me but

23   I know inside that you're dying a little bit today, I know you

24   are and you have been.  Because he's let everyone around him

25   now, his friends, his family, he's humiliated his family.  He

J659BLAS

is a piraya in the only area that he's ever known and loved
which is basketball.  He was working recently, the only job he
could get, was in a youth center for underprivileged youths
that were at risk, like him; teaching them basketball.  An
article came out a couple of weeks ago in the L.A. papers.  He
got fired.  He got fired.  There's nothing that he can do.  He
is radioactive in the only area that he's ever known or loved.

        So with regard to general deterrence, as Judge Kaplan
noted, there is no need -- excuse me, for specific deterrence,
there is no need for it here because nobody -- you're never
going to get back into the profession again.

        With regard to general deterrence, Judge, everybody
knows that if you get arrested you're done.  So if anybody --
there is no coach out there that is thinking about taking
$4,100, which was the least amount that anybody took in this
case, and he also only had one bribe as opposed to many, many,
many that the other coaches had.  No one is thinking that if
Tony Bland doesn't go to jail, oh, maybe I can get away with
this.  It doesn't make any sense.  You get arrested and you're
done.  You get arrested and you're acquitted and you're done.
That's how sensitive it is in the NCAA.  So there is no need
for the general deterrence.  He is the embodiment of general
deterrence.

        After he blew his knee out, as I said, he didn't give
up.  He became a trainer and eventually an assistant coach for

J659BLAS

1      two universities and he became one of the top assistant coaches

2      in the country.  This is what's incredibly tragic.  Because of

3      his stupidity and his criminal activity, which is all this was,

4      it was unbelievably out of character, and he did it.  He broke

5      the law.  He was on the cusp of becoming a head coach.  And

6      talk about an unbelievable turnaround with the way that he grew

7      up to become a head coach, Judge, it's a miracle; really of

8      miraculous proportions that he could have gotten that high, but

9      he blew it.  All the hard work that he did his entire life.  He

10     blew it.

11            And he helped so many people on his way up.  There are

12     no letters bashing him.  There are no letters, victim letters

13     where people are saying Tony was a bad guy, he treated me

14     badly.  I find that in cases, oftentimes what happens is people

15     that are disgruntled, that have had problems with the

16     defendant, will sometimes write letters to the judge and say,

17     Listen, this guy was really bad to me at one point, you need to

18     know what a bad guy he is.  I know this.  And Mr. Mark and I

19     had a sentencing last night with a bank CEO who stole a lot of

20     money and there were a lot of bad victim letters that came in,

21     really ugly stuff from people that were his employees.

22            You didn't get any of that here.  You didn't get any

23     of that even from the players that were negatively impacted by

24     his behavior because he's beloved by all the people that he's

25     coached.  And this has been going on for decades.  He's done so

J659BLAS

1    many positive things.

2          It's not like he was just doing his job and he did it

3    well, Judge.  You got a letter the other day that you showed to

4    us this morning.  That's the kind of stuff he was doing.  He

5    was helping at-risk kids out on his own for no pay.  He was

6    always a positive person in the community, a lot more positive

7    than the average person would be.

8          THE COURT:  Was that the organization that he was

9    working for?

10         MR. LICHTMAN:  No.  That was not, Judge.  It was a

11   different one.

12         What I also find remarkable, and this is a more subtle

13   point; it was never really brought up.  He was raised around

14   violence, drugs.  This kind of stuff has an impact.  It doesn't

15   just get buried.  It doesn't just get swallowed and you forget

16   it.  I mean seeing the violence in his house, the incredible

17   instability, the sickness that he felt in his stomach everyday

18   when he lived in that crushing poverty with the violence and

19   the lunacy around him.  You don't just forget that and it

20   disappears.  Probably, which is the reason why we're here

21   now -- I wrote that in my papers, I think I did -- is that

22   there was a semblance of that that still remained obviously

23   that damaged him.

24         But the point is this.  Look at what kind of father he

25   is.  You know, it's not easy for somebody that grew up like

J659BLAS

1   that with all of those bad examples around him.  There were no

2   good role models.  Everything was bad around him.  How is it

3   that a guy like that -- forget that he avoided his friends,

4   forget that he made something of himself, forget all that.  How

5   about the fact that he's capable of being in a healthy

6   relationship with his wife and he raises kids who love him?

7   He's got a kid that's going to Princeton.  I should be as good

8   of a parent as Tony Bland is.  My kids are freshman in high

9   school.  I got to yell at them to do their homework.  And I

10  wasn't raised in a crack house, getting taken at eight years

11  old like he was.  It's a miracle that he did that.

12          And, Judge, that's another factor that should be

13  viewed.  We don't just look at his life as what he did wrong

14  and why he's here.  He's here for a reason.  We know why he's

15  here.  He broke the law.  He's not here because he's a good boy

16  like me and Mr. Mark.  He's here because he broke the law.

17          But look what he did in his life.  Look at the

18  positive role model he provided to his children.  His kid is

19  going to Princeton and not on an academic scholarship.  There

20  are no academic scholarships to Princeton.  He's going there

21  because he got in because of his academics.  He could have gone

22  to another school and gotten a free ride, obviously, for

23  football.  He could have gone to any number of schools.  He

24  went there because of his academics and he's going to play

25  football there.

J659BLAS

1          That's the kind of parent he is and his -- the mother

2     of his son said, she wrote in the letter:  I tell people all

3     the time I get credit for his academics -- referring to their

4     son -- I get credit for his academics and athleticism but his

5     heart and kindness comes from his dad.  And that's who Tony

6     Bland really is.  And there's nothing that any prosecutor or

7     any agent can say.  But he was good to so many people, Judge,

8     and a lot better than most people would ever be.  Anybody who

9     has ever crossed his path comes away with a smile and that's

10     true.

11          He's now, as I said, not someone who is capable of

12     getting back into the profession.  He's 38 years old.  He's

13     finished.  He's finished.  I don't know that he's ever going to

14     get a job; maybe get a job as a laborer.  He's finished.  He

15     got fired from the job I just mentioned.

16          I've become friendly with Book Richardson, who I know

17     you have tomorrow, I don't mean to bleed that over into this,

18     but I think it has some impact here.  Couldn't get a job in a

19     Starbucks.

20          These guys are finished.  They're done at this age.

21     And, Judge, it's a scary thought when you've got children to

22     support, you've got families to support, that you're done; in

23     the only thing you've ever known, you are finished.  He is

24     never getting back into basketball.  He has no other skills

25     that he's ever developed.  It was to train.  It was to coach.

J659BLAS

That's all he and Book Richardson and the rest, that's all they know.  And it's their fault that they're here for it, but it doesn't change the fact that they don't have any other place to go when this is over.

With regard to probation's recommendation, they noted that it was his first conviction, they noted his incredibly difficult upbringing, and they noted that a sentence of incarceration would be greater than necessary to achieve the sentencing goals in this case.  And for those reasons they recommended a probationary sentence.

And, as I said, there are other reasons.  Obviously, James Gatto, Merl Code and Dawkins received nine months, six months, and six months after going to trial and losing.  The government, as I said, backed probation's sentencing recommendation for all three in front of Judge Kaplan, which was twelve, eight, and eight instead of the nine, six, and six they received.  So the government agreed with probation's recommendation there because it had some jail time; it doesn't have any jail time, so suddenly they don't agree with it.  But they're suggesting that he should get six months in jail, so he should get the same amount of time as Dawkins, who is exponentially more responsible, blew trial, and he should get the same sentence.  I mean I don't need to comment on that.  I think it's self-evident.

In addition, their conduct was repeated.  It was

J659BLAS

extensive.  Tony's was a one-shot deal.  Yes, they're saying
that if they hadn't arrested him it could have led to more.
Well, but it didn't.  And there is no evidence that anything
happened before him that suggested that he broke the law.

I would respectfully request for all of those reasons
as well as his upbringing and all the positives that he's done
not -- taking into account the negatives that got him here,
that a probationary sentence, if anybody would ever get in any
of these cases, it would be Tony Bland.  He's the least
culpable and the government agrees.

Judge, for all those reasons -- I don't want to
belabor and repeat and I think the reason why I'm belaboring
and repeating is because I don't want to stop talking for this
guy.  I love him.  And he has been a friend.  I've had some
tough times in life.  Tony Bland is the one when I picked up my
phone in the morning, Tony Bland is the one that sent me the
text.  That's the kind of guy he is.  He cares about people
around him.  He has never been, "Woe is me, woe is me."  He's
kept a positive outlook and I can tell you, Judge, whatever
happens to him today -- and I know that none of this is easy
for you -- he's going to still keep that positive outlook.
Thank you.

THE COURT:  Thank you, Mr. Lichtman.

Mr. Bland, you have an absolute write to address the
court before I impose sentence.  Is there anything that you

J659BLAS

1    wanted me to know?

2            THE DEFENDANT:  Thank you, your Honor.  I just want to

3    apologize to the Court.  I want to apologize to the prosecuting

4    attorneys, my family, my community.  I'm sorry.  Most

5    importantly the young people that I misled that looked up to

6    me, I just want to say sorry.

7            THE COURT:  Thank you, Mr. Bland.

8            In deciding what sentence to impose, in addition to

9    the sentencing guidelines and the commentaries thereto, I have

10   considered all of the factors set forth in Section 3553(a) of

11   Title 18 of the United States Code, including, as most relevant

12   to Mr. Bland, the nature and circumstances of the offense and

13   the history and characteristics of Mr. Bland.  I've considered

14   the need for the sentence imposed to reflect the seriousness of

15   the offense, to promote respect for the law, to provide a just

16   punishment for the offense, to afford adequate deterrence to

17   criminal conduct, and to protect the public from further

18   crimes.  Because there are a number of codefendants, I've

19   considered the need to avoid unwarranted sentence disparities

20   among similarly situated defendants.  And having considered

21   these factors, it is my intention to accept the recommendation

22   of probation and impose a sentence of two years probation with

23   a special condition of one hundred hours of community service

24   and a $100 special assessment.  I do not impose a fine as I

25   find that Mr. Bland is not able to pay a fine.  And I will also

J659BLAS

order him to forfeit $4,100, I believe he has already

consented.

        I believe that this sentence is sufficient but not

greater than necessary to comply with the purposes of

sentencing set forth in Section 3553 for the following reasons.

        First, I want to acknowledge a couple of the

undercurrents that this case has that have been discussed to

some extent today and that were testified to at the trial with

Mr. Dawkins and Mr. Code, the trial before me.  And I want to

emphasize that I do believe that this is a serious offense.

There is a debate that is currently going on concerning whether

or not college players, particularly college basketball

players, ought to be paid.  I've had that debate with any

number of my clerks over the years.  And I certainly am of the

view that there is a current status that the rules -- and we

are, at a certain level, talking about NCAA rules -- have to be

followed and that, in any event, the way that that debate plays

out plays no role in the way that I thought about this case.

        Mr. Bland pled guilty to a federal offense.  It was a

serious offense.  And I do believe that there are identifiable

victims of the offense.  I do believe that the institutions

were victimized.  Putting aside the foibles of the individuals

that run those institutions, putting aside what they did or

didn't know, what they did not allow or did allow, the

institutions were themselves victimized.

J659BLAS

1          I believe that the students and the players were

2    victimized by the activities of Mr. Bland and his codefendants.

3    Thankfully, it appears that certain of them have not been

4    affected in their careers, but that does not mean that they

5    were not put at risk in some fashion by the activities of the

6    defendants, including Mr. Bland.

7          At the trial we saw the videotape of Mr. Bland in that

8    hotel room.  We saw him take the cash that was provided by

9    Mr. Dawkins and the government cooperators.  And I dare say

10   that it was probably a very different picture of Mr. Bland than

11   was provided to me by the two dozen or so letters that were

12   submitted by his lawyers.  Those letters paint a much different

13   picture, an individual who, as Mr. Lichtman pointed out, came

14   from a very unfortunate background that was marred not only by

15   poverty but by drug addiction, violence, and mental health

16   issues, and he was able to overcome all of that and make a

17   career for himself.  And, as impressively, because I see young

18   men of color everyday in this courtroom that have similar

19   background and are not able to overcome those backgrounds, and

20   Mr. Bland was able to do that without nary a brush with the

21   criminal justice system.  And that's something that I put a lot

22   of emphasis on in considering what would be an appropriate

23   sentence for Mr. Bland.  This is his first offense.  And it is

24   not a crime of violence.  So, regardless of any other

25   circumstances, I thought those were two things that I weighed

J659BLAS

1      very heavily in determining an appropriate sentence.

2              I do disagree with Mr. Lichtman.  I don't think that

3      Mr. Bland is finished.  He may not be able to work in the field

4      of his choice but he is still a relatively young man and he

5      will.  And he has a very strong support system, as is made

6      clear by the letters that have been submitted, letters not only

7      by his family but by people whom he befriended and whom will no

8      doubt continue to support him after today.

9              I also do not believe that specific deterrence is an

10     issue in this case.  I am convinced to a moral certainty that I

11     will not see Mr. Bland again, at least not in this courtroom,

12     for any violation of the conditions of probation.  I do not

13     believe that I will see him again because he has committed

14     another offense.

15             And I also agree that -- with respect to this case

16     that there is no need for general deterrence.  This case has

17     gotten a lot of publicity.  The individuals who are -- so it's

18     also a fairly narrow universe of individuals who would come

19     within the realm of general deterrence.  I don't know how many

20     NCAA men's basketball coaches or coaches there are but it is a

21     fairly limited universe, and I think they all understand what

22     the consequences are of engaging in this type of activity.

23     Mr. Bland has not only lost his job but will in all likelihood

24     not be able to work in that field going forward.

25             So I don't think, given his background, given the

J659BLAS

1    nature of this offense, given everything that he has gone

2    through, that it is appropriate or is necessary to sentence

3    Mr. Bland to any period of incarceration.

4              With that, does counsel know of any legal reason other

5    than what has already been argued why I should not impose the

6    sentence as I've indicated?

7              Mr. Mark.

8              MR. MARK:  No, your Honor.

9              THE COURT:  Mr. Lichtman.

10             MR. LICHTMAN:  No, your Honor.

11             THE COURT:  In that event, it is the judgment of the

12   Court that Mr. Bland be sentenced to two years of probation on

13   the one count of conviction with a special condition of

14   probation of one hundred hours of community service.

15             The standard conditions of probation will apply as

16   well as the following mandatory conditions.

17             You must not commit another federal, state, or local

18   crime.

19             You must not unlawfully possess a controlled

20   substance.

21             You must refrain from any unlawful use of a controlled

22   substance and submit to a drug test within fifteen days and at

23   least two periodic drug tests thereafter as determined by

24   probation.

25             You must pay the special assessment.

J659BLAS

1          And if you live outside of the district it is

2    recommended that you be -- outside of this district it is

3    recommended that you be supervised by the district of your

4    residence.

5          The following special conditions apply.

6          You must not incur new credit charges or open

7    additional lines of credit without the approval of the

8    probation office.  You must provide the probation office with

9    access to any requested financial information.

10          And, as I've indicated, you are to perform one hundred

11    hours of community service.

12          As I've indicated previously, I will not impose a fine

13    as I find that given his current financial situation he's

14    unable to pay a fine.

15          You are ordered to forfeit $4,100.

16          Are there any open counts with respect to Mr. Bland?

17          MR. MARK:  Yes, your Honor.  I believe the government

18    moves to dismiss the open counts which I believe are Five,

19    Eight, and Nine.

20          THE COURT:  That application is granted.

21          That constitutes the sentence of the Court.  I believe

22    that there was a guidelines stipulation in the plea agreement

23    with Mr. Bland.

24          MR. MARK:  Yes.  There was a waiver of his right to

25    appeal of a sentence at or below the guidelines and we believe

J659BLAS

1    that that's in effect here, your Honor.

2            THE COURT:  Mr. Bland, the upshot of that is that your

3    appellate rights are severely restricted because of that

4    stipulation.

5            Mr. Lichtman, will you assure me that you will

6    thoroughly and promptly discuss with Mr. Bland the effect of

7    the plea agreement on his appellate rights?

8            MR. LICHTMAN:  Yes, your Honor.

9            THE COURT:  Are there any other applications?

10           MR. MARK:  Not from the government, your Honor.

11           MR. LICHTMAN:  And none from the defense, Judge.

12           THE COURT:  In that event we are adjourned.

13   Mr. Bland, good luck to you, sir.

14           THE DEFENDANT:  Thank you, your Honor.

15           (Adjourned)

16

17

18

19

20

21

22

23

24

25